THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: July 27, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*In re MK Diamond Products, Inc.*

————

Serial No. 86813875

————

Robert A. Becker of Fross Zelnick Lehrman & Zissu PC,
    for MK Diamond Products, Inc.

Andrea R. Hack, Trademark Examining Attorney, Law Office 108,
    Kathryn E. Coward, Managing Attorney.

————

Before Shaw, Kuczma and Lebow,
    Administrative Trademark Judges.

Opinion by Lebow, Administrative Trademark Judge:

Applicant, MK Diamond Products, Inc., seeks registration on the Principal

Register of the proposed product configuration mark shown below:



under Section 2(f), 15 U.S.C. § 1052(f), for "circular saw blades for power operated saws," in International Class 7.[1] The mark is described in the application as follows:

> The mark consists of a configuration of a circular saw blade comprising the curved portion of a repeating slot design around the circumference of the goods. The portions of the blade shown in broken lines are intended solely to indicate the positioning of the mark and are not part of the mark.

Applicant appeals from the Examining Attorney's final refusals to register pursuant to Section 2(e)(5) of the Trademark Act, 15 U.S.C. § 1052(e)(5), on the ground that the mark is a functional design for the goods, and alternatively under Sections 1, 2, and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052, and 1127, on the ground that the mark consists of a non-distinctive product design that has not acquired distinctiveness under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f).[2]

The appeal is fully briefed.[3] For the reasons explained below, the refusals are affirmed.

---

[1] Application Serial No. 86813875 was filed on November 9, 2015 under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based on Applicant's claim of first use of the proposed mark anywhere in November 2005, and first use in commerce in March 2006.

[2] In her denial of Applicant's request for reconsideration, the Examining Attorney also maintained the final refusal under Trademark Rule 2.61(b), 37 C.F.R. § 2.61(b), on the ground that Applicant did not adequately respond to a request for information. That refusal was not pursued in her brief, however, and we consider it withdrawn. *See* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 1203.02(b) ("Even if the examining attorney does not specifically state in the appeal brief that the refusal or requirement has been withdrawn, the Board may treat the refusal/requirement to have been withdrawn if no mention is made of it in the brief.").

[3] Trademark Rule 2.126, 37 C.F.R § 2.126, requires that all submissions made to the Board must be filed in at least 11-point type. However, Applicant's briefs are in 10.5 font. Had Applicant used the correct font size, the briefs would be overlength. Additionally, Applicant scanned its briefs into .pdf documents rather than simply converting them from text documents, which made the problem more difficult to detect. The Examining Attorney has not objected to this deficiency. Although we exercise our discretion to consider the briefs and

## I.  The Amended Mark

In 2007, Applicant applied to register on the Supplemental Register the same three-dimensional configuration of a circular saw blade that it originally sought to register in this application.[4] Although the 2007 application was initially refused on grounds of functionality and non-distinctiveness, the functionality refusal was withdrawn. Thus, the mark originally proposed for registration in this application was registered on the Supplemental Register in 2008.[5]

The mark in the original drawing of the current application and the mark shown in the drawing of the Supplemental Register registration depict "a repeating slot design around the circumference of the goods with an additional three circular holes between each slot and the slot next to it" as shown in the close-up excerpt below:[6]

---

will address the merits, to the extent such actions were intended to bypass the Board's page limitation requirements, they are frowned upon. Applicant and its counsel are reminded that future filings not in conformity with the Board's rules may not be considered.

[4] September 12, 2016 Response to Office Action, TSDR 13-14.

[5] Registration No. 3548458, registered December 16, 2008. A copy of this registration was not made of record during examination. The Board does not take judicial notice of registrations in Office records. *In re Jonathan Drew Inc.*, 97 USPQ2d 1640, 1644 n.11 (TTAB 2011). Nonetheless, because Applicant submitted substantial portions of the file history for that registration as a basis for argument throughout prosecution, and because the Examining Attorney addressed the registration in her office actions, referred to it in her brief, and did not object to its discussion, we will treat the registration as though it is of record. *See e.g., See, e.g., In re Olin Corp.*, 124 USPQ2d 1327, 1335 n.22 (TTAB 2017) (because the examining attorney addressed applicant's registrations in her brief and did not object to its discussion, Board treated the registrations as though they were of record).

[6] The excerpt is taken from Applicant's revised drawing submitted with its December 1, 2017 Response to Office Action, TSDR 16, which Applicant described as "show[ing] the mark with a higher resolution, so that the curved shape of the cut-outs will be clear." *Id.* at 9.



The features claimed as the mark in both applications included two separately identifiable features: (1) a repeating slot design around the perimeter of the blade consisting of angled notches, curves extending towards the interior of the blade from each notch, and circular holes at the interior end of those curves ("keyholes"); and (2) a repeating pattern of three horizontal circular holes in between each of the repeating notched slots aligned with the perimeter of the blade.

As amended, the drawing in the application in this appeal depicts the same repeating slot design and repeating pattern of three horizontal circular holes, but only the shape of the slot is claimed. The mark drawing and an excerpt thereof is produced below:



## II. Applicant's Procedural Arguments

Applicant devotes approximately twenty-five percent of its brief to its argument that the functionality refusal is procedurally improper.[7] Specifically, Applicant argues that the USPTO is precluded from finding the applied-for mark functional because it found the previous version of its mark non-functional and registrable on the Supplemental Register in 2008.[8] Applicant asserts that the functionality refusal is particularly inequitable because the facts and record in this case are the same facts and record that were considered in the earlier prosecution.[9] Applicant further insists that the USPTO's earlier determination of non-functionality "essentially encouraged" Applicant to make "a full decade's worth of investments in the mark" that were, "unbeknownst to Applicant-a waste of money," since Applicant was under the impression that "all it need[ed] to do" in order to get the mark registered on the Principal Register was demonstrate secondary meaning.[10]

The Examining Attorney counters that trademark rights are not static, and that eligibility for registration must be determined on the basis of the facts and evidence in the record at the time registration is sought, citing *In re Morton-Norwich Prods., Inc.,* 671 F.2d 1332, 213 USPQ 9, 18 (CCPA 1982).[11] She contends that "the Office

---

[7] 9 TTABVUE 2-7.

[8] *Id*. at 2-3.

[9] *Id*. at 3.

[10] *Id.* at 3-4. Notwithstanding Applicant's argument, the record is devoid of evidence demonstrating investment in the applied-for mark beyond investments in the product itself, which Applicant deems successful.

[11] 9 TTABVUE 4.

should not be tied to an error if one were made in the past, and that the applicant does not have a 'right' to a registration based on any prior registration for a different configuration mark with different elements claimed as features of the mark."[12] She further states that the USPTO's inconsistent treatment "may be unfortunate, but it does not give rise to any right in the applicant to registration of functional elements of the configuration of its goods in the present application, and it does not turn a non-distinctive product configuration into a source-indicative presentation."[13]

We are constrained to agree with the Examining Attorney that Applicant's ownership of a mark on the Supplemental Register does not entitle Applicant to an automatic registration of its proposed mark in the present application. Applicant cites no legal authority that compels us to depart from our duty to decide each case on its own merits, even on equitable grounds. It is well settled that the USPTO is not bound by decisions of examining attorneys who examined applications for an applicant's previously registered marks based on different records. *See In re Cordua Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1635 (Fed. Cir. 2016) ("The PTO is required to examine all trademark applications for compliance with each and every eligibility requirement … even if the PTO earlier mistakenly registered a similar or identical mark suffering the same defect."); *In re Am. Furniture Warehouse CO*, 126 USPQ2d 1400, 1407 (TTAB 2018) ("[C]onsistency in examination is not itself a substantive rule of trademark law, and a desire for consistency with the decisions of prior

---

[12] *Id*. at 5.

[13] *Id*.

examining attorneys must yield to proper determinations under the Trademark Act and rules."); *In re USA Warriors Ice Hockey Program, Inc.*, 122 USPQ2d 1790, 1793 n.10 (TTAB 2017) ("The issuance of Applicant's first registration does not require the approval of a second registration if, on the facts of the case, it would be improper to do so under the governing legal standard.").

As mentioned, even if we were to assume that the facts and circumstances surrounding the prior application and registration were exactly the same as those in this case, it remains our statutory duty to determine whether, based on the facts and evidence before us, the present application should be allowed. But in any event, the facts and record in this case are different from the facts and record in Applicant's prior application. Contrary to Applicant's assertions, the Examining Attorneys handling this application adduced additional evidence not found in the prior record, as did Applicant, resulting in a substantially larger record consisting of approximately 800 pages of material. Further, the marks are plainly different. Whereas the originally applied-for mark identified three additional elements of Applicant's blade design including the V-shaped gullets or angled notches, keyhole cut-outs at the interior ends of the cut-outs, and a repeating pattern of three circles in between the cut-outs, the amended mark comprises only the curve of the cut-outs.

We have carefully reviewed the factual record submitted during two versions of the mark – the originally filed drawing and the drawing as amended; our findings and holdings relate only to the latter. Applicant's decision to amend its original mark to something else is a "'new ball game,' which must be predicated on current thought."

*See In re Hunter Publ'g Co.*, 204 USPQ 957, 963 (TTAB 1979). Accordingly, Applicant's ownership of a registration on the Supplemental Register for a different mark does not—and cannot—affect our finding with respect to the applied-for mark in its current form.

## III. Circular Saw Blades

There are many types of circular saw blades on the market. "Just as there are different saws and different project materials, there are different circular saw blades – each suited to a tool and a task."[14] Different types of saw blades are designed to cut different materials and work with different power saws. "Typically, most types of blades are limited to cutting a specific range of materials. Abrasive wheels are needed for cutting steel. Diamond blades for concrete, tile, stone and masonry materials. Steel or carbide toothed blades for lumber and wood products and so forth."[15] Blades that cut a variety of different materials are often referred to as multi-purpose blades.[16]

Additionally, "[s]ome circular saw blades are suited for stationary tools like table

---

[14] March 10, 2016 Office Action, TSDR 13. The Internet materials attached to the March 10, 2016 Office Action do not contain URLs or access dates, which was not a requirement in ex parte appeals at that time. On June 7, 2018, the Board extended the admissibility requirements for Internet materials set forth in *Safer Inc. v. OMS investments Inc.*, 94 USPQ2d 1031, 1039 (TTAB 2010) to ex parte appeals and now requires Internet printouts to include a date and source/URL. *In re I-Coat Co.*, 126 USPQ2d 1730, 1733 (TTAB 2018) (applying Safer to evidence submitted by examining attorneys and applicants in ex parte cases). We note also that all Internet materials submitted by the examining attorneys in subsequent actions did include dates and URLs.

[15] September 12, 2016 Response to Office Action, TSDR 39 (Exhibit 5).

[16] December 13, 2018 Response to Office, TSDR 103 (Delahaut Decl. ¶ 6).

saws and compound miter saws, while others are suited for handheld saws."[17] Blades can be further categorized by their style of rim types, such as turbo rim, continuous rim, and segmented rim.[18] Some blades are designed specifically for wet cutting, while others are designed for dry cutting.[19] The choice of wet or dry depends on performance and job requirements.[20]

Saw blades are often advertised or promoted based on the application, material, type of saw used, or some combination of general features.[21] For instance, a blade designed for cutting melamine may be promoted as a Melamine Blade or Melamine Miter Blade to simplify how it is identified, but what makes it suited for its task is the negative hook angle, which has a larger than average tooth count and a thin kerf.[22] "But manufacturers are not always so specific, requiring customers to be more familiar with all the ins and outs of standard saw blade design in order to make the best purchases."[23] Saw blade consumers must therefore rely on their understanding of saw blade features in order to properly match a saw to the task and maximize performance.[24]

---

[17] March 10, 2016 Office Action, TSDR 14 (lowes.com).

[18] June 14, 2018 Office Action, TSDR 112-14 (kmstools.com).

[19] *Id*. at 141-42 (concretenetwork.com).

[20] *Id*.

[21] June 14, 2018 Office Action, TSDR 127-128 (ereplacementparts.com).

[22] *Id*. at 128. "Kerf is the width of the cut that a saw blade makes, the width of its cutting teeth." *Id*. at 130.

[23] *Id*. at 128.

[24] *Id*. at 137.

Circular saw blades may include the following important features:

- Gullets – The space between the tips of adjacent saw teeth "that permit debris to be ejected from the blade and cutting area"; smaller gullets or slots in a saw blade tend to inhibit feed rate, whereas larger gullets tend to remove debris faster; and

- Expansion Slots – Cut-outs in a blade that start from the outside edge and often "include small holes at the end of a curved shape ("keyholes"[25]). These cuts give the blade a little room to expand when heating up during use, and they help dissipate some of the heat of the blade," which makes the blade cut more efficiently, vibrate less, and last longer.[26]

Many circular diamond saw blades have a series of cut-outs around their perimeter to provide cooling and stress relief during cutting.[27] The evidence submitted by both the Examining Attorney and Applicant suggests that the terms "cut-outs," "gullets," "slots," and "expansion slots" are often used interchangeably.

Applicant's Tiger Tooth Circular Saw Blades

Applicant is a provider of circular saw blades. In March 2006, Applicant began selling circular diamond saw blades with a design that includes the applied-for mark, which it calls its "Tiger Tooth" blades.[28] Applicant states that the Tiger Tooth blades are manufactured using a process called vacuum brazing that causes the diamond crystals of a diamond blade to adhere directly to the steel core of the blades.[29]

---

[25] 7 TTABVUE 14.

[26] *Id*. at 129 (ereplacementparts.com).

[27] September 12, 2016 Response to Office Action, TSDR 19-20 (Delahaut Dec. of September 9, 2016 ¶ 3).

[28] *Id*. at 18 (¶ 2).

[29] *Id*. at 19 (¶ 3).

According to Applicant, that process "allows the thermal conductivity of the diamond to work more effectively, thereby causing the heat to dissipate easily without the need for … cut-outs to provide cooling during cutting" and "also allows the blade to be bi-directional."[30] Applicant further states that because many circular diamond saw blades require cut-outs to provide cooling and stress relief, consumers expect to see them, which Applicant claims is the main reason it uses cut-outs in its Tiger Tooth blades.[31]

Applicant explains that the precise shape of the cut-outs of its Tiger Tooth blades "was arbitrarily selected" in order to differentiate its Tiger Tooth circular diamond saw blades from its competitors.[32] Applicant's Tiger Tooth blade is shown below from several angles:[33]

  

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] December 1, 2017 Response to Office Action, TSDR 18-34.

## IV. Functionality

"The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 34 USPQ2d 1161, 1163-64 (1995); *Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1489 (TTAB 2017). Nor does it protect trade dress in a functional design merely because an investment has been made to encourage the public to associate a particular functional feature with a single manufacturer or seller. *Id.* Accordingly, Section 2(e)(5) of the Trademark Act, 15 U.S.C. § 1052(e)(5), prohibits registration of "a mark which … comprises any matter that, as a whole, is functional." Such matter cannot be registered, even with a showing that consumers recognize the proposed mark as a source identifier. *See TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 58 USPQ2d 1001, 1007 (2001).

A product feature or design that is functional is "incapable of serving as a trademark." *Grote Indus., Inc. v. Truck-Lite Co.*, 126 USPQ2d 1197, 1202 (TTAB 2018). A product design or product feature is considered functional in a utilitarian sense if: (1) it is "essential to the use or purpose of the article," or (2) it "affects the cost or quality of the article." *TrafFix*, 58 USPQ2d at 1006 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 214 USPQ 1, 4 n.10 (1982)). In *TrafFix*, the Supreme Court confirmed the "*Inwood* formulation" as the "traditional rule" of functionality. 58 USPQ2d at 1006.

In making our determination of functionality under *Inwood*, we generally are guided by the analysis first applied in *Morton-Norwich*, 213 USPQ at 15-16; *see Valu Eng'g Inc. v. Rexnord Corp.*, 278 F.3d 1268, 61 USPQ2d 1422, 1427 (Fed. Cir. 2002); *Kohler*, 125 USPQ2d at 1489; *Poly-America, L.P. v. Illinois Tool Works Inc.*, 124 USPQ2d 1508, 1513 (TTAB 2017). *Morton-Norwich* identifies the following inquiries or categories of evidence that may be helpful in determining whether a particular design is functional: (1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) facts indicating the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product. *Morton-Norwich*, 213 USPQ at 15-16. However, the Supreme Court has made clear that if functionality is established under *Inwood*, further inquiry into facts that might be revealed by a full analysis of all types of *Morton-Norwich* evidence will not change the result. *TrafFix*, 58 USPQ2d at 1006 ("Where the design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for the feature."); *see also Poly-America*, 124 USPQ2d at 1514.

Functionality is a question of fact and depends on the totality of the evidence in each particular case. *Valu Eng'g*, 61 USPQ2d at 1424; *In re Caterpillar Inc.*, 43 USPQ2d 1335, 1339 (TTAB 1997); TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP") § 1202.02(a)(v) (October 2018). In a given case, any of the four *Morton-*

*Norwich* factors might not necessarily be relevant to a finding of functionality, nor do all four factors have to weigh in favor of functionality to support a finding of functionality. *In re Change Wind Corp.*, 123 USPQ2d 1453, 1456 (TTAB 2017); *In re Heatcon, Inc.*, 116 USPQ2d 1366, 1370 (TTAB 2015). We bear in mind that "product design almost invariably serves purposes other than source identification." *TrafFix*, 58 USPQ2d at 1005 (quoting *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 US. 205, 54 USPQ2d 1065, 1069 (2000)).

A.    Utility Patents Disclosing Utilitarian Advantages of the Design

The first *Morton-Norwich* factor is whether a utility patent discloses the utilitarian advantages of the design. The existence of a utility patent "is strong evidence that the features claimed therein are functional" and "[w]here the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device." *TrafFix*, 58 USPQ2d at 1005. In addition, third-party utility patents may be relied upon as evidence; ownership of the utility patent is not relevant. *In re Pohl-Boskamp GmbH & Co.*, 106 USPQ2d 1042, 1046 n.22 (TTAB 2013); *In re Mars Inc.*, 105 USPQ2d 1859, 1861 (TTAB 2013); *In re Virshup*, 42 USPQ2d 1403, 1405 (TTAB 1997).

Patent applications are also probative evidence under this factor. *Valu Eng'g*, 61 USPQ2d at 1429. We are not limited to the claims in a patent in determining functionality; we may also consider the disclosures in the entire patent. *See In re*

*Becton Dickinson and Co.*, 675 F.3d 1368, 102 USPQ2d 1372, 1377 (Fed. Cir. 2012) (statements in a patent's specification may be "equally strong evidence of functionality") (citations and internal quotations omitted); *In re Howard Leight Indus. LLC*, 80 USPQ2d 1507, 1511 (TTAB 2006) (quoting J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7:89.1 (4th ed. 2006) ("It is proper to look at the disclosure (as distinguished from the claims) in a utility patent as evidence of the functionality of a shape.").

To support the functionality refusal, the Examining Attorney introduced four third-party utility patents and two published third-party utility patent applications into the record: U.S. Patent Nos. 8,701,536 ("the '536 Patent"), 5,896,800 ("the '800 Patent"), 5,351,595 ("the '595 Patent"), 4,776,251 ("the '251 Patent"), and U.S. Patent Application Nos. 20090199692A1[34] and 20090199693A1 ("the '693 Application").

    1.    The '536 Patent

The '536 Patent, titled "Circular saw blade with offset gullets," relates to circular saw blades and the need for improved gullets in order to reduce fatigue and increase the life of the circular saw blades.[35] The improvement suggested by this patent, and represented in Fig. 1a of the patent shown below, is offset gullets to reduce or eliminate airflow, resulting in less noise and increased blade rigidity in the area of the gullets, which in turn helps to avoid cracks and prolongs blade life.[36]

---

[34] Because Patent Application No. 20090199692A1 is the underlying application for the '536 Patent, and is essentially the same as the '536 Patent except for a few clarifying amendments in some of the claims, we need not consider it separately.

[35] June 14, 2018 Office Action, TSDR 18-28.

[36] December 14, 2018 Response to Office Action, TSDR 39; *Id*. at 17-18.



The invention's background describes the prior art:

> Gullets, in the form of cutouts extending inwardly from the periphery of the blade, are often interspaced between the cutters to aid cutting, by relieving stresses in the blade and removing swarf.[37] **A variety of gullet configurations may be used.** The actual gullet configuration employed for a particular blade is based on the cutting application(s) for which the blade is expected to be used. (Emphasis added).
>
> Saw blades having relatively narrow gullets have been found useful in sawing of construction material with portable power saws, and in other masonry cutting applications on stationary machines, where smooth cutting action is desired. It has been found that the smoothness of cutting action is enhanced when the cutters are placed relatively close to one another, such as provided by the use of relatively narrow gullets…. Alternatively, saw blades having relatively wide gullets … typically have a relatively large radius at their inner ends, which have been found to provide the blade with relatively high fatigue strength. These gullets may thus be beneficial in relatively high-stress cutting environments, such as floor sawing of asphalt or concrete, in which other blade types tend to fail due to stress cracks propagating from the gullets.
>
> Keyhole-shaped gullets attempt to combine benefits of both narrow and wide gullets. These gullets enable the cutters of a blade to be positioned relatively close to one another (e.g., so as to provide a smooth cutting action) while also providing each gullet with a relatively large radius at its radially inner end (e.g., so as to help reduce crack formation).[38]

This patent details the way cut-outs along the periphery of a circular saw blade

---

[37] "Swarf" is defined as "material (such as metallic particles and abrasive fragments) removed by a cutting or grinding tool" (https://www.merriam-webster.com/dictionary/swarf). The Board may take judicial notice of dictionary definitions. *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.*, 213 USPQ 594 (TTAB 1982), aff'd, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983), including online dictionaries that exist in printed format or have regular fixed editions. *In re S. Malhotra & Co. AG*, 128 USPQ2d 1100, 1104 n.9 (TTAB 2018).

[38] *Id*. at 15-16.

have utilitarian functions: they provide blade stress relief, remove swarf, and provide smooth or aggressive cutting depending on how they are spaced. Additionally, it explains that the use of keyhole-shaped cut-outs (such as those used by Applicant at the interior end of its cut-outs, no longer claimed in the amended mark), combine the benefits achieved by either type of spacing. Notably, the patent teaches that a variety of gullet configurations may be used depending on the desired cutting application to which the blade is directed.

Applicant argues that "the cut-outs shown in the patented image follow a straight path from the outside to the inside, so they cannot be relevant to whether a curved shape, let alone the curved shape of the applied-for mark, is functional."[39]

### 2.    The '800 Patent

The '800 Patent, titled "Circular Saw Blade," relates to carbide-tipped circular saw blades and an invention directed to maximizing the strength of a saw blade in order to enhance its endurance.[40] The image below, shown as Fig-2 in the patent, provides an excerpt of the patented blade configuration; the numbers 32, 34, and 36 refer to the expansion slot, neck of the expansion slot, and body of the expansion slot,



respectively:[41]                                    The        description        of        the        preferred

---

[39] 7 TTABVUE 12.

[40] June 14, 2018 Office Action, TSDR 29-41.

[41] December 14, 2018 Response to Office Action, TSDR 41; June 14, 2018 Office Action, TSDR 33.

embodiments in the patent explains that the gullet "may include an expansion slot 32 which extends from and is continuous with the gullet"; that "expansion slots 32 enable flexing of the blade, under high-heat cutting application[s]"; and that "shallow gullets and shorter expansion slots add to the tooth or tip flexibility, which in turn enables the blade to stay on line during cutting."[42]

Applicant argues that the blades shown in the patent have jagged edges and cut-outs that do not resemble those in Applicant's drawing. As to the expansion slot shown in Fig-2 above, Applicant states that it "is straight and completely unlike the curved shape claimed by Applicant as its mark," so the patent does not indicate that curved shapes, such as Applicant's curved shapes, are functional.[43]

### 3. The '595 Patent

The '595 Patent, titled "Thin Kerf Circular Saw Blade," is an invention to improve the performance of thin kerf circular saw blades by combining and optimizing the design parameters of a saw blade's individual structural features such as the hook angle of cutting teeth, a plurality of expansion slots, a shallow gullet, reinforcing shoulder, carbide cutting elements, and a thin profile.[44]

The first image below, Fig. 6 drawing in the patent, provides an excerpt of the patented blade configuration wherein the numbers 32, 34, 36, and 38 refer to a stress dispersion hole, outer slot, central slot, and narrowing third inner slot of the cut-out

---

[42] June 14, 2018 Office Action, TSDR 33.

[43] 7 TTABVUE 14.

[44] June 14, 2018 Office Action, TSDR 42-56.

in the cut-out formation, respectively.[45] The second image is an excerpt from the drawing in Fig-1, showing the full expansion slot and stress dispersion hole in the patented cut-out more simply.[46]



(Fig. 1)

In the description of the prior art of the patent, it is explained that

> Conventional circular saw blades have a plurality of teeth spaced about the outer periphery of the blade, and **a plurality of expansion slots of various configurations in the outer edges of the blade in order to dissipate stress and prevent heat warpage of the blades.** Expansion slots are not new to the industry and are intended to relieve stress, to aid in cleaning out the kerf, to attain straighter cutting action and to achieve other beneficial results. … **There are different types of saw blades having expansion slots of various designs for cutting specific types of material.** … As with the low speed blades, the high speed blades utilize expansion slots to prevent blade warpage due to heat buildup in the blade.[47] (Emphasis added).

Applicant asserts that because the cut-outs in the drawings of this patent are "jagged, not curved," the benefits resulting from the blade design features in this patent "have nothing to do with curved paths, let alone the curved path shown in the applied-for mark, and cannot possibly show that the curved path—which constitutes the applied-for mark—is functional in any way."[48]

---

[45] December 14, 2018, TSDR 48.

[46] *Id.*

[47] June 14, 2018 Office Action, TSDR 43.

[48] 7 TTABVUE 14.

### 4. The '251 Patent

The '251 Patent, titled "Circular Saw Blade with Circumferentially Extending Laser-Cut Slots," pertains to a patent for circular saw blades that have "strain compensating, heat dissipating slots" in the body, the primary object being to provide a blade that is easy to hammer; runs quieter, cooler, and longer than prior art blades; is harder to crack; is resistant to sawdust packing in its slots; and will not damage either lumber or guides.[49] The background of the invention explains that prior art blades may have radially extending laser-cut slots projecting outwardly from the central bore to compensate for various strains occurring in the blades during their operation.[50] The image shown here, representing Fig. 1 in the patent, depicts the



blade with the preferred embodiment of features:[51]

Applicant argues that this patent is irrelevant to the case at hand, since the cut-outs of the patented blade do not resemble the curved cut-outs of the applied-for mark and therefore cannot show "that curved shapes are helpful in reducing strain, heat, sawdust, or damage to the material being cut."[52]

---

[49] June 14, 2018 Office Action, TSDR 57-64.

[50] June 14, 2018 Office Action, TSDR 57.

[51] December 14, 2018 Response to Office Action, TSDR 50.

[52] 7 TTABVUE 14.

5.    The '693 Application

The '693 Application, titled "Circular Saw Blade with Elliptical Gullets," is directed to elliptical gullets. As with the '536 Patent, it explains that a plurality of gullets interspaced around the circumference of the blade reduces fatigue and increases the life of a circular saw blade.[53] Fig. 1e below from the patent shows a close-up of the elliptical shaped gullets (and similar shapes within dotted lines) in one embodiment of the patent. Fig. 2d below shows one proposed design that traces the elliptical shape gullet concept of the patent.[54]



Applicant, in reply, states that "this patent does not indicate in any way that curved shapes, let alone the one shown in the applied-for mark, are functional."[55]

6.    Analysis of the Patent Evidence

Summarizing the patent evidence, the Examining Attorney states that

> [T]he disclosures and preferred embodiments in the patents and patent applications reveal the functionality of significant aspects of saw blade configuration, namely, the angled cut-outs or slots in a circular saw blade. The patent evidence shows a clear utilitarian rather than merely decorative basis for the slots and shows that the precise distance

---

[53] June 14, 2018 Office Action, TSDR 65-76.

[54] December 14, 2018 Response to Office Action, TSDR 56.

[55] 7 TTABVUE 15.

between the cut-out elements has distinct functionality as does the angle, shape, and placement. The patent evidence shows that these cut-outs or shapes, or the angle of the gullets or slots are, overall, functional.[56]

Applicant does not devote much attention to the details of the patent evidence submitted by the Examining Attorney, giving it relatively curt treatment. Instead, Applicant insists that all the patent evidence is irrelevant because the cut-outs shown in the drawings and images of the patents are not curved and therefore have no probative value in determining that the applied-for mark is functional. According to Applicant, the Examining Attorney's statement that the patent evidence shows that the cut-outs or shapes, or the angle of the gullets or slots, are overall functional and utilitarian "is at best a statement that the cut-outs are de facto functional, which is insufficient to justify a functionality refusal.[57]

Because Applicant discusses and distinguishes between the terms "de facto functionality" and "de jure functionality" throughout its brief, we briefly discuss the difference here as well. Applicant correctly notes that examining attorneys, in general, no longer use the de facto/de jure distinction in Office actions that refuse registration based on functionality. *See* TMEP § 1202.02(a)(iii)(B). Although the USPTO has retired those terms from the language of functionality refusals, the concepts still apply. *In re Heatcon, Inc.*, 116 USPQ2d at 1371.

"In essence, de facto functional means that the design of a product has a function, i.e., a bottle of any design holds fluid." *In re R.M. Smith, Inc.*, 734 F.2d 1482, 222

---

[56] 9 TTABVUE 13.

[57] 7 TTABVUE 19.

USPQ 1, 3 (Fed. Cir. 1984). De facto functionality does not necessarily defeat registrability. *Morton-Norwich*, 671 F.2d at 1337, 213 USPQ at 13 (a design that is de facto functional, i.e., 'functional' in the lay sense . . . may be legally recognized as an indication of source.'). De jure functionality means that the product has a particular shape "because it works better in this shape." *R.M. Smith*, 222 USPQ at 3. Product designs that are de jure functional are unregistrable. *In re Lincoln Diagnostics Inc.*, 30 USPQ2d 1817 (TTAB 1994).

Applicant contends that the Examining Attorney appears to have misconstrued the Federal Circuit's statement in *Becton, Dickinson,* 102 USPQ2d at 1377 (Fed. Cir. 2012) that a patent need not "claim" the "exact configuration" of an applied-for mark to undermine an applicant's assertion that a mark is not de jure functional."[58] Specifically, Applicant argues that

> [T]he court wasn't focusing on the word 'exact' and saying that if patent evidence showed that an analogous but differently-shaped element of a product design was functional, that helped show that the specific shape of the design in the subject mark was functional. Rather, the court was focusing on the word "claim" and merely pointing out that if the statements in the patent, rather than the claim itself, showed that the specific shape shown in the subject mark was functional, that was relevant to show that the mark was functional.[59]

Although the *Becton* court cited *TrafFix* for the proposition that it does not matter whether statements disclosing a design's functionality come from a patent's claims or its specification, that does not suggest, as Applicant would have it, that to be evidence of functionality, the claims or specification must mention the exact configuration for

---

[58] 9 TTABVUE 19.

[59] *Id.*

which trademark protection is sought. *TrafFix* made this clear, because the Court in that case explained that statements in a patent can show that another party's particular design is functional because it is similar in shape to similar functional features disclosed in the patent. *See TrafFix, 58* USPQ2d at 1005-06 (holding that the patent at issue was strong evidence of functionality of a two-spring-mounted road sign, even though the patent disclosed that the two springs were spaced apart and the design for which trademark protection was asserted placed the two springs close together); *see also In re Shenango Ceramics*, 362 F.2d 287, 150 USPQ 115, 120 (CCPA 1966) ("Although the patent claimed the middle or vibration-throttling rib in combination with a pedestal or foot rib, the result is no different where the configuration is present on a plate having no pedestal rib… . Thus the result here is not dependent on the precise scope of the patent claims."). The disclosures in such a patent may demonstrate that utilitarian benefits are provided by a basic design feature irrespective of its specific shape. Thus, patents (and applications) for analogous designs can provide competent evidence of de jure functionality.[60]

We thus find that the patent evidence of record supports a finding that cut-outs interspaced along the periphery of a circular saw blade are de jure functional in providing one or more utilitarian benefits. As the '536 patent explains, gullets in the form of cut-outs extending inwardly from the periphery of the blade relieve stress and remove swarf. The particular configuration chosen depends, at least in part, on the

---

[60] Of course, this is not a blanket rule. The facts and circumstances of each case will inform the probative value of any statement in a patent document as it might apply to the design feature(s) at issue in a trademark case.

cutting application. Both narrow and wide gullets provide utilitarian benefits, one of which may be more suited to a particular cutting project. Accordingly, cut-outs may come in a variety of configurations and provide utilitarian benefits within that variety. Applicant's curve, being marginal or slight, falls within the ambit of shapes described as functional in the patent.

Additionally, the '595 Patent explains that expansion slots are commonly used in the circular saw blade industry and that circular saw blades commonly have a plurality of expansion slots in various configurations along the outer edges of the blade to dissipate blade stress, prevent blade heat warpage, clean out kerf, attain straighter cutting action, and other utilitarian benefits. These benefits exist independent of their shape, though one may vary the design to make them more beneficial to the task at hand. In addition to discussing the utilitarian benefits of cut-outs generally, the '800 Patent, '251 Patent, and '693 Application provide examples of improved peripheral cut-outs that provide enhanced utilitarian benefits beyond those provided by standard cut-out designs.

Applicant does not contest the statements in the patent evidence regarding the utilitarian benefits provided by interspaced peripheral circular saw blade cut-outs, nor does Applicant provide evidence to counter those disclosures, such as adducing contradictory patent evidence showing either that curved cut-outs do not provide utilitarian benefits or, more pertinently, that curved cut-outs along the periphery of a saw blade cause circular saw blades to operate less efficiently or in a diminished manner; Applicant simply argues that they are not applicable. But this does not

refute the weight of the evidence establishing that cut-outs along the perimeter of a saw blade provide significant utilitarian benefits irrespective of their specific shape.

B.  Third-Party Evidence of Functionality

 The Examining Attorney provided various articles and examples of third-party circular saw blades, in addition to the patent evidence of record, in determining that Applicant's applied-for mark is functional. For example, an article titled "Diamond Blades – Blade Guide 101" on the retail website kmstools.com discusses diamond circular saw blades, including blades with segmented rims such as those found on Applicant's segmented Tiger Tooth diamond blades that feature the applied-for mark.[61] The article explains that the reason segmented blades, often referred to as dry cutting blades, can be used on dry applications without water

> is due to the cut outs—or segments—on the edge of the blade. These allow for air flow and cooling of the blade core. The segments also allow for better exhaust of debris, allowing for a swifter cut. One of the risks to the lifetime of a diamond blade is overheating, which affects the bond and can warp the blade.[62]

Applicant does not contest the factual assertions made in the article but asserts that the blade shown does not have the curved shape of the cut-outs in the applied-for mark.[63] Although the cut-outs may not be curved, a comparison of an excerpt of

---

[61] June 14, 2018 Office Action, TSDR 112-14.

[62] *Id.* at 113-14.

[63] 7 TTABVUE 10-11.

the segmented blade from the article to an excerpt from the drawing of Applicant's amended applied-for mark shows they are similar:

| Close-up Excerpt of Article Blade | Close-up Excerpt of Proposed Mark |
|---|---|
| | |

Applicant argues that "there is nothing in it that indicates that a curved shape, let alone the curved shape of Applicant's cut-out, causes blades to cool more effectively or exhaust debris more effectively."[64] However, consistent with the evidence of record indicating that the utilitarian benefits provided by peripheral cut-outs are not shape-dependent, there would be no need to mention that curved shapes, specifically, provide such benefits unless they do not. If all cut-outs, whether angled, straight, or curved, provide those utilitarian benefits as the evidence clearly suggests, then, absent evidence that Applicant's particular cut-out does not similarly enjoy this functional benefit, we infer that Applicant's cut-outs also cause blades to work better or operate more efficiently than blades that do not have such cut-outs.

Applicant agrees that the removal of debris is a concern with saw blades used to cut thick substances, "which creates a situation in which debris must be removed to make room for the blade to continue deeper into the material to be cut" but asserts that

---

[64] *Id.*

> [O]ur Tiger Tooth blades are generally used on site to cut thin and/or hollow materials, such as pipes, and each cut is accomplished quickly. It would be very unusual for one of our Tiger Tooth blades to become entirely encompassed within the material being cut. Therefore debris removal is generally not an issue when our blades of this type are used, and our customers are not concerned with how well our blades remove debris. Furthermore, removal of slurry is not an issue relevant to our blades, since they are used for dry cutting.[65]

Applicant's point is unavailing, since Applicant's identification of goods for "circular saw blades" is not limited to cutting a particular material, nor is it limited to blades for dry cutting. *See Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 61 USPQ2d 1422, 1427-29 (Fed. Cir. 2002) (finding functionality based on one particular use of the design that fell within the goods and services identified in the application, even if the design would not be functional as to other encompassed uses).



Another article, titled "Circular Saw Buying Guide" on the retail website lowes.com, makes a distinction between "gullets" (the notched space between the blade's teeth) and "expansion slots" (the deeper cut-out slots) that may extend from the gullets, both of which are shown on Applicant's Tiger Tooth blades.[66] It explains that on standard circular saw blades: "Gullets between the teeth remove chips from the work pieces. Expansion slots cut into the rim help prevent the blade from warping as it expands and contracts during use. They reduce vibration, creating a straighter cut."[67]

---

[65] December 14, 2018 Response to Office Action, TSDR 103 (Delahaut Decl. ¶7).

[66] June 14, 2018 Office Action, TSDR 118.

[67] *Id*. at 120.

The article further explains that segmented diamond blades, such as the Kobalt-branded image shown here, "have a rim divided by gullets similar to those on a standard blade." For comparison purposes, we show an excerpt taken from the above image on the lowes.com website juxtaposed with an excerpt from the drawing of Applicant's applied-for mark:



Applicant does not contest any of the statements in the article but argues that the cut-outs shown in the article, including those in the Kobalt-branded blade above, "are not curved and are 'similar' only in the sense that they are cut-outs, not in the sense that they are similarly-shaped cut-outs."[68] However, to our eyes, the blade shown above has cut-outs which, though "angled,"[69] are closely similar to Applicant's curved

---

[68] 7 TTABVUE 12.

[69] Applicant objects to the Examining Attorney's use of the term "angle" in describing Applicant's proposed mark as an attempt to mischaracterize its shape as straight, and considers absurd her statement that "this curve or angle is so arbitrary, so insignificant, and so difficult for consumers to ascertain without shopping for a protractor." 12 TTABVUE 3-4. We agree that Applicant's "slot design" is curved, although only slightly. But the Examining Attorney is correct in recognizing that each slightly curved slot radiates from the periphery of the blade at an angle to an offset keyhole, and not toward the center of the blade (the arbor hole). The Examining Attorney's comment about the need to use a protractor appears to be

cut-outs. That is, in both blades the slot is offset from the gullet via a channel which is either straight or, in Applicant's mark, slightly curved.

Applicant further asserts that nothing in the article indicates that curved shapes "more effectively prevent a blade from warping or vibrating than any other shapes do."[70] Nonetheless, as we explained earlier, absent evidence that, by slightly curving the cut-outs, Applicant's blade design do not enjoy the same utilitarian benefit as an angled, non-curved cut-outs, we infer from the evidence that all such cut-outs, whether straight, curved, elliptical, or angled, affect the quality of the blade by helping to guard against warping and vibration and thus make the blades perform better than blades that do not have cut-outs.

Another article from the saw blade manufacturer ChinShine, at diamond-blade.org, explains that the shape of the gullets and slots are often dictated by material and performance considerations:

> The spaces of air that separate the diamond segments are called gullets or slots. The slots are there to improve air flow, cutting materials dust, dissipate heat, and remove slurry from the cut, helping to maintain the saw blade's cutting performance. **The size and shape of the gullets vary from blade to blade and will depend on the type of material the blade [is] designed to cut.**
>
> For example, blades for cutting asphalt tend to have wider, U-shaped slots while diamond saw blades for concrete tend to have narrower U-shaped slots or Key hole slot[s]. The more abrasive the material, the wider the slot should be to allow for better heat dissipation. Other slots shapes [sic] include teardrop and angled. Segmented diamond saw

---

tongue in cheek, but underscores the negligible difference between Applicant's slight curve and other blade designs.

[70] *Id.*

blades with narrow slots are generally for marble and granite while keyhole shaped slots tend to be for general purpose.[71] (Emphasis added).

Applicant does not dispute any of the statements in the article but asserts the photo depicted in the article "shows a shape nothing like the applied-for mark."[72] Although the article appears to have been relied on by the Examining Attorney for the factual information it provides and not to provide an example of a similar blade, when we compare Applicant's mark to the photo in the article, we find them to be quite similar:

| Close-up Excerpt of Article Blade | Close-up Excerpt of Proposed Mark |
|---|---|
| | |

Applicant also argues that the article's discussion of keyholes is irrelevant because Applicant has disclaimed them in the amended applied-for mark through dotted-lines and, further, that the article does not specifically discuss curved cut-outs when indicating that cut-outs improve air flow, reduce dust, dissipate heat, and remove slurry.[73] However, we find the article provides additional corroborating evidence to the overall record, which consistently indicates that certain utilitarian benefits are provided by peripheral cut-outs between blade segments. That is, the shape of slots may vary from blade to blade, but all such slots improve saw blade performance.

---

[71] June 14, 2018 Office Action, TSDR 123.

[72] 7 TTABVUE 12-13.

[73] *Id.*

An article titled "Saw Blade 101" from the retail website ereplacement.com explains that gullets "allow saw dust and chips to be ejected from the blade and cutting area," and discusses expansion slots as follows:

> Cuts in the blade that start from the outside edge are called "expansion slots," and they usually include small holes **at the end of a curved shape**. These cuts give the blade a little room to expand when heating up during use, and they help dissipate some of the heat in the blade. Keeping heat down like this helps saw blades cut more efficiently and last longer. Expansion cuts also help reduce blade vibration a little. (Emphasis added).[74]

As with the other third-party evidence, Applicant does not dispute the information presented in the article concerning gullets or expansion slots, asserting only that the article does not show curved cut-outs or explain how curved cut-outs provide any utilitarian benefits.[75] Applicant concedes that vibration is an issue for saw blades used in manufacturing products or constructing structures, but argues its Tiger Tooth blades are marketed to customers "who simply want to cut materials apart, such as in demolition or rescue, or in plumbing or masonry."[76] However, Applicant also sells its blades through general hardware stores such as ACE Hardware, True Value, and Do-It-Best, which cater to the general public and may use those blades for other purposes.[77]

Another article, titled "Expansion Slots" from the tool provider website circularsawblade.net, explains the purpose of laser-cut slots spaced periodically

---

[74] 9 TTABVUE 10-11.

[75] 7 TTABVUE 13.

[76] December 14, 2018 Response to Office Action, TSDR 104 (Delahaut Decl. ¶9).

[77] *Id*. at September 12, 2016 Response to Office Action, TSDR 23 (Delahaut Decl., ¶14)

through the blade plate: "Engineers thought of this idea to allow the expansion of the saw blade "inside" itself. Although these slots look like they are done for artistic purposes, they aren't; they are there so that they can absorb the expansion of the metal, preventing blade warping."[78] Applicant concedes that warping is an issue for conventional diamond blades due to overheating, but claims its Tiger Tooth blades "are not conventional diamond blades."[79] However, Applicant's identification of goods covers "circular saw blades" and is therefore not limited to a type of use, or a specific type of user. Nor is it limited to non-conventional diamond saw blades or even diamond blades. Applicant's identification of goods covers all types of circular saw blades for power saws, including standard blades.

Below are excerpts from images of third-party circular saw blades, all of which provide additional examples of various cut-outs. Notably, the fifth example shows a curved cut-out that is in part very similar to the curve of Applicant's cut-out. Others show cut-outs that appear similar to a curve by virtue of multiple angles:[80]



---

[78] June 6, 2017 Office Action, TSDR 5-7.

[79] *Id*. at 104-05 (Delahaut Decl. ¶10).

[80] June 14, 2018 Office Action, TSDR 128-145; 7 TTABVUE 13; March 10, 2016 Office Action, TSDR 6-8, 15-16; September 12, 2016 Response to Office Action, TSDR 26-31, 94-96 (Ex. 1-3, Delahaut Decl.); June 6, 2017 Office Action, TSDR 28-31.



  The use of similar features on competing products tends to show that the features at issue are functional. *See, e.g.*, *Becton, Dickinson*, 102 USPQ2d at 1378 (evidence that an applicant's competitors sold products that feature the same features sought to be registered "underscores the competitive need to copy the functional features" of the mark).

C.    Applicant's Statements

The Examining Attorney argues that Applicant appears to concede that Applicant's cut-outs are functional. [81] She quotes from paragraph 3 of the September 9, 2016 declaration of Applicant's Vice President, Brian Delahaut, who states:

> Many circular diamond saw blades have a series of "cut-outs" (keyways) around their circumference. Although the *presence* of such cut-outs is functional in most other diamond saw blades in that these cut-outs provide cooling and stress relief during cutting, the presence of such cut-outs in our Tiger Tooth blades is virtually non-functional. The requirement and functionality of the cut-outs are all but eliminated by the unique vacuum brazing process we use. This vacuum brazing process adheres the diamond crystals directly to the steel core of the blade at the cutting edge. The vacuum brazing allows the thermal conductivity of the diamond to work more effectively, thereby causing heat to dissipate easily without a direct need for the cut-outs to provide cooling during the cutting. This process also allows the blade to be bi-directional. The main reason why we nevertheless included cut-outs in our Tiger Tooth blades was because consumers expect to see some kind of cut-outs in circular diamond saw blades. Moreover, the precise shape

---

[81] 9 TTABVUE 14.

of the cut-outs shown in the application (the "Subject Cut-Outs") was arbitrarily selected and has no function whatsoever in the cutting process. On the contrary, we use the distinctive shape of the Subject Cut-Outs to differentiate our Tiger Tooth circular diamond saw blades from those of our competitors.[82]

Applicant argues that Mr. Delahaut's statements that the cut-outs in Applicant's Tiger Tooth blades are "virtually" non-functional, and that the requirement and functionality of the cut-outs are "all but eliminated" by its unique vacuum brazing process, merely refers to the existence of the cut-outs, not their shape.[83]

We are not persuaded by Applicant's characterization of Mr. Delahaut's statements as being limited to the existence of the cut-outs but not also to their shape. If they were, there would be no need to use the terms "virtually" and "all but eliminated" in his explanation. Instead, we find the statement consistent with the weight of the evidence, which shows the design of blade perimeter cut-outs dictated primarily by utilitarian concerns and for that reason, Applicant's diamond blade customers expect to see them. Applicant here is discussing its Tiger Tooth saw blades, which may well need less cooling and stress relief than some other diamond saw blades provided by its competitors, but nowhere does Applicant indicate that its Tiger Tooth blades are not cooled more, or are not provided with additional stress relief, by using the cut-outs. The weight of the evidence suggests that they are.

More importantly, while Applicant focuses its argument on the purported lack of a direct need for cut-outs on its Tiger Tooth branded blades (due to the use of a

---

[82] September 12, 2016 Response to Office Action, TSDR 18-19.

[83] 7 TTABVUE 17-18.

vacuum brazed process during the manufacturing process that adheres the diamond crystals directly to the steel core of the blade at the cutting edge), Applicant makes no mention of other circular saw blades it provides, or may provide, that do not use such a process. Notably, Applicant has not applied to register its proposed mark for use on circular saw blades that are manufactured using a vacuum brazed process that allegedly eliminates the benefits provided by peripheral cut-outs; rather, Applicant's identification of goods covers all circular saw blades, including those that are not manufactured using such a process. *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1690 n.4 (Fed. Cir. 1993) ("Registrability is determined based on the description in the application, and restrictions on how the mark is used will not be inferred."); *In re Dominick's Finder Foods, Inc.*, 184 USPQ 507, 508 (TTAB 1974) ("an applicant's right of registration must be determined … on the basis of the [goods or] services sought to be registered" therein).

The Examining Attorney also points to Applicant's own website, which indicates that circular saw blades require sufficient airflow to prevent overheating.[84] Specifically, she highlights Applicant's statement that

> When using a DRY blade, the user must be aware of distinct operating practices to ensure optimum performance. DRY cutting blades require sufficient airflow about the blade to prevent overheating of the steel core. This is best accomplished by shallow, intermittent cuts of the material along with periods of 'free-spinning' for several seconds to maximize the cooling process.[85]

---

[84] 9 TTABVUE 15.

[85] December 14, 2018 Response to Office Action, TSDR 83-85.

She asserts that the information provided by Applicant on its website belies Applicant's contention that the applied-for mark is not functional.[86]

Applicant attempts to clarify this statement by explaining that the page she refers to on Applicant's website "has nothing to do with the 'Tiger Tooth' blades" and instead pertains to conventional blades that "need to be cooled to avoid melting of the metal powder. However, the Tiger Tooth blades in which the subject mark is used are not conventional diamond blades."[87] The problem with Applicant's argument is that Applicant seeks to register its mark for "circular saw blades," a description that includes all circular saw blades, including conventional blades.

### D. Other Considerations

Applicant submitted records of five third-party registrations on the Principal and Supplemental registers of three-dimensional configurations of goods as "further evidence" that the mark is registrable, including Registration Nos. 1603200, 3012303, 4121154, 4068756, and 3795460. Among those registrations, Applicant highlights Reg. No. 1603200 for a product configuration consisting of "the tapered nozzle, the curved trigger, the blunt glue stick chamber and the streamlined curve of the handle portion" for hot glue guns that was permitted to register. Applicant has not persuaded us that any of these registrations have relevance to the question of functionality in the present case, as they all relate to completely different technologies and marks that differ in all respects from Applicant's proposed mark.

---

[86] *Id.*

[87] 7 TTABVUE 21.

Applicant also relies on two Board cases, *In re Ovation Instruments, Inc.*, 201 USPQ 116 (TTAB 1978) and *In re Weber-Stephen Prods. Co.*, 3 USPQ2d 1659 (TTAB 1987), in support of its position that the applied-for mark is not functional. *Ovation* was decided prior to *Morton-Norwich*, and both cases applied a competitive need standard that the Supreme Court thereafter rejected as a requirement in *TrafFix*, 58 USPQ2d at 1003. The U.S. Court of Appeals for the Federal Circuit has since clarified that while the existence of alternative designs can be considered as a legitimate source of determining whether a mark is functional in the first place, "once a product feature is found functional based on other considerations, there is no need to consider the availability of alternative designs because the feature cannot be given trade dress protection merely because there are alternative designs available." *Valu Eng'g*, 61 USPQ2d at 1428. Furthermore, the Board in *Ovation* and *Weber-Stephen* did not have the benefit of utility patent evidence strongly supporting a finding of functionality, as we do in this case. Moreover, unlike the situation in *Ovation,* we find the cut-outs comprising Applicant's applied-for mark to be utilitarian notwithstanding their slight curve. That is, the overall configuration is primarily and essentially dictated by functional or utilitarian considerations that enhance the quality or performance of the saw blades.

Based on the totality of the record, we find that the applied-for mark as a whole is primarily functional. The overall appearance of the applied-for mark affects the quality of the blades under the *Inwood* test and, as a whole, "is in its particular shape because it works better in that shape," *Becton, Dickinson*, 102 USPQ2d at 1376,

because it provides cooling, stress relief, and other benefits such as the removal of swarf, particularly with respect to blades manufactured without vacuum brazed technology or other means that do not eliminate added benefits provided by cut-outs in the blade's design.

The record further demonstrates that the arrangement of Applicant's interspaced cut-outs along the circumference of the blade, emanating from a notch in the blade, is dictated by utilitarian concerns. Applicant's slightly curved cut-out design is not manifestly different from other blade designs in a manner suggesting the cut-outs do not provide the same benefits that similar third-party blade cut-outs provide. Applicant understands that consumers expect cut-outs on diamond blade saws. If consumers expect them to be there, it is either because they are used decoratively, which the evidence here does not suggest, or it is because they make the products work better.

Having found the applied-for mark to be functional under *Inwood*, *TrafFix*, and their progeny without reliance upon the other factors discussed in *Morton-Norwich*, and because "there is no requirement that all of the categories of evidence identified in *Morton-Norwich* appear in every case in order to" find functionality, *In re Change Wind Corp.*, 123 USPQ2d at 1456; *Heatcon*, 116 USPQ2d at 1370; *Becton, Dickinson,* 102 USPQ2d at 1376, we need not address the evidence in those other categories. For the sake of completeness, however, we offer the following brief assessment of the evidence in those other categories.

1. Advertisements Touting Utilitarian Advantages of the Design

"If a seller advertises the utilitarian advantages of a particular feature of its product, this constitutes strong evidence of functionality." *Kistner Concrete Prods., Inc. v. Contech Arch Techs., Inc.*, 97 USPQ2d 1912, 1924 (TTAB 2011). The Examining Attorney argues that

> Applicant's advertisements and packaging tout that the blade "cuts virtually everything on site," indicating that it is a "multi-purpose blade" that "uses the latest MK Vacuum Brazed Technology" next to a photo showing the configuration of the goods, the implication being that the latest technology includes the configuration shown.[88]

Applicant points out that the Examining Attorney does not specifically identify the advertisement in the record, but she seems to be referring to the following advertisement provided by Applicant:[89]



---

[88] 9 TTABVUE 14.

[89] September 12, 2016 Response to Office Action, TSDR 36 (Delahaut Decl., Exhibit 4).

We agree with Applicant that while the above advertisement may tout the general performance of Applicant's Tiger Tooth blade next to a photo of it, it does not ascribe that performance to the applied-for mark. *See Change Wind*, 123 USPQ2d at 1462 (applicant's advertising was "inconclusive on the issue of functionality" even though it touted some of the same benefits discussed in applicant's utility patent, because it did not "explicitly tie the touted benefits to the various aspects of the [wind] turbine depicted in the drawing in this application.").

2. Availability of Functionally Equivalent Designs

With regard to this *Morton-Norwich* factor, Applicant argues that there are "many alternative designs of blades that are available to be used by, and indeed are used by, Applicant's competitors."[90] The Examining Attorney concedes as much, stating that "the precise placement of the cut-outs may leave room for competitors to use alternative configurations."[91]

However, apart from conclusory statements, Applicant did not provide any evidence demonstrating that the cut-outs in other circular saw blades offer the same performance benefits as Applicant's cut-outs. *See, e.g.*, *Textron, Inc. v. ITC*, 753 F.2d 1019, 224 USPQ 625, 629-30 (Fed. Cir. 1985) (simply providing non-working wooden mock-ups of alternative designs was deemed insufficient to demonstrate "that any component of the Bridgeport Series I, other than the column or ram, has been or can be designed in an alternative manner and work as well, at an equivalent cost"); *In re*

---

[90] 7 TTABVUE 9.

[91] 9 TTABVUE 16.

*Teledyne Indus., Inc.*, 696 F.2d 968, 217 USPQ 9, 11 (Fed. Cir. 1982) ("The record here is devoid of evidence showing the likelihood that other manufacturers could successfully compete in the showerhead trade, i.e., that there exist commercially feasible, alternative showerhead configurations which others could utilize to successfully compete with appellant on the basis of utility."). Further, as mentioned earlier, it is well-settled that "[t]he availability of alternative designs does not convert a functional design into a non-functional design." *Kistner*, 97 USPQ2d at 1928 (citing *TrafFix*, 58 USPQ2d at 1007), and "[i]t is probative of functionality that others in the industry use similar designs; they do not have to be identical." *Change Wind*, 123 USPQ2d at 1465 (citing *Becton, Dickinson*, 102 USPQ2d at 1378).

3. Simple or Inexpensive Method of Manufacture

There is no evidence in the record showing that Applicant's applied-for mark results from a simple or inexpensive method of manufacture of the goods. Accordingly, this *Morton-Norwich* factor is not probative in our determination of functionality.

E.    Conclusion as to Functionality

Because substantially all of Applicant's applied-for mark is dictated by the function it performs, we find that the configuration is essential to the use or purpose of the goods and as a whole is functional. *TrafFix*, 58 USPQ2d at 1006. The record supports the Examining Attorney's assertion that Applicant's adoption of the mark was primarily and essentially dictated by functional or utilitarian considerations. "A shape or a configuration which, in its concept, is *essentially* utilitarian and non-

arbitrary cannot function as a trademark under the provisions of the statute, either on the Principal or Supplemental Register." *In re Honeywell, Inc.*, 187 USPQ 576, 578 (TTAB 1975).

Applicant's asserted intention to adopt a curved cut-out versus the straight or angled cut-outs of its competitors in order to indicate source may well be true, but

> intent or lack of intent at the time of adoption of a particular design is not controlling [as to whether a design is functional]. Nor is proof that a particular container actually functions as a means of indication of source to some purchasers. Not all designs or words which in fact indicate or come to indicate source will be restricted in use to a single merchant.

*In re Water Gremlin Co.*, 635 F.2d 841, 208 USPQ 89, 90 (CCPA 1980).

To give Applicant the trademark registration it seeks here would give it a potential perpetual monopoly on a slightly curved basic design of cut-outs along the outer edges of a circular saw blade. One can envision only several different alternative configurations for the shape of cut-outs emanating from the perimeter of a circular saw blade – straight, angled, curved, or some combination thereof. We believe that a registration covering one of the few basic shapes available would interfere with the fundamental right to compete.

## V.  Acquired Distinctiveness

Because we affirm the functionality refusal, it is unnecessary to reach a decision on the Sections 1, 2 and 45 refusal and whether Applicant's circular saw blade has acquired distinctiveness under Section 2(f). In fact, even if there was evidence sufficient to demonstrate acquired distinctiveness, it would not permit the registration of a functional design. *E.g.*, *TrafFix*, 58 USPQ2d at 1007 ("Functionality

having been established, whether [the mark] has acquired secondary meaning need not be considered"). Nonetheless, for completeness we address the Examining Attorney's separate refusal to accept Applicant's Section 2(f) claim of acquired distinctiveness.

"Product design almost invariably serves purposes other than source identification, and consumers are aware that even the most unusual product design is intended not to identify the source of the goods, but to render the product itself more useful or appealing." *AS Holdings, Inc. v. H & C Milcor, Inc.*, 107 USPQ2d 1829, 1837 (TTAB 2013) (citing *Wal-Mart*, 54 USPQ2d at 1069). As such, "product designs can never be inherently distinctive and will always require evidence of acquired distinctiveness or secondary meaning" to be registrable as marks. *Id.* (citing *Wal-Mart*, 54 USPQ2d at 1070). Applicant concedes this by proceeding under Trademark Act § 2(f). *Yamaha Int'l v. Hoshino Gakki*, 840 F.2d 1572, 6 USPQ2d 1001, 1005 (Fed. Cir. 1988).

Acquired distinctiveness means that consumers have come to associate the mark with a single source. *See, e.g., Inwood*, 214 USPQ at 4 n.11; *Coca-Cola Co. v. Koke Co. of Am.*, 254 U.S. 143, 146 (1920); *Tone Bros. v. Sysco Corp.*, 28 F.3d 1192, 31 USPQ2d 1321, 1329 & n.11 (Fed. Cir. 1994); *Textron, Inc. v. U.S. Int'l Trade Comm'n*, 753 F.2d 1019, 224 USPQ 625, 627 (Fed. Cir. 1985). To make this showing, Applicant must demonstrate that the relevant members of the public—consumers of circular sawblades—understand the primary significance of the applied-for mark as

identifying the source of its blades rather than the blades themselves. *In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1422 (Fed. Cir. 2005).

A. Degree of Non-Distinctiveness

While there is no fixed rule concerning the amount and quality of the evidence required to establish acquired distinctiveness, the burden is heavier in a case that involves a product's configuration. *Kohler*, 125 USPQ2d at 1504; *In re Udor U.S.A. Inc.*, 89 USPQ2d 1978, 1986 (TTAB 2009); *In re Ennco Display Sys. Inc.*, 56 USPQ2d 1279, 1283-84 (TTAB 2000); *see also EFS Mktg., Inc. v. Russ Berrie & Co.*, 76 F.3d 487, 37 USPQ2d 1646, 1649 (2d Cir. 1996) ("[C]onsumers do not associate the design of a product with a particular manufacturer as readily as they do a trademark or product packaging trade dress."). Analogizing to the heavier burden on an applicant for a highly descriptive term, an applicant for a product design mark bears a heavier burden because consumers are not predisposed to viewing the product features as source identifiers. *Kohler*, 125 USPQ2d at 1504; *In re Udor U.S.A. Inc.*, 89 USPQ2d at 1978; *Wal-Mart*, 54 USPQ2d at 1069. The evidence "must relate to the promotion and recognition of the specific configuration embodied in the applied-for mark and not to the goods in general." *Change Wind*, 123 USPQ2d at 1467 (citing *Inwood Labs.*, 214 USPQ at 4 n.11); *see also In re SnoWizard, Inc.*, 129 USPQ2d 1001, 1005 (TTAB 2018) (citing *Converse, Inc. v. Int'l Trade Comm'n*, 909 F.3d 1110, 128 USPQ2d 1538, 1546 (Fed. Cir. 2018)).

The Examining Attorney has provided persuasive evidence demonstrating that consumers of circular saw blades typically look to the particular design features of a

blade in order to select a blade that matches the task for which the blade is chosen, rather than as source-indicators. Peripheral cut-outs, in particular, serve a number of important non-source-identifying purposes that include but are not limited to providing cooling, stress relief, vibration reduction, swarf removal, and debris exhaustion during the cutting process. Applicant agrees that the presence of cut-outs is functional in most circular saw blades, and that consumers expect to see them on diamond blades.[92] That is the "main reason" Applicant includes them as a design feature of its Tiger Tooth diamond blades.[93] Because peripheral saw blade cut-outs are common, Applicant must make a particularly strong showing to prove acquired distinctiveness.

B. Evidence of Acquired Distinctiveness

Our analysis of the evidence of acquired distinctiveness is based on the totality of the evidence. As explained by the Federal Circuit,

> the considerations to be assessed in determining whether a mark has acquired secondary meaning can be described by the following six factors: (1) association of the trade dress with a particular source by actual purchasers (typically measured by customer surveys); (2) length, degree, and exclusivity of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) intentional copying; and (6) unsolicited media coverage of the product embodying the mark.

*Converse,* 128 USPQ2d at 1546; *In re SnoWizard,* 129 USPQ2d at 1005 (holding *Converse* applicable to Board proceedings). No single fact is determinative. *Id; In re Tires, Tires, Tires Inc.,* 94 USPQ2d 1153, 1157 (TTAB 2009); *In re Ennco Display,* 56

---

[92] September 12, 2016 Response to Office Action, TSDR 18 (Delahaut Decl. ¶3).
[93] *Id.*

USPQ2d at 1283. We discuss those factors that are relevant to this case.

### 1. Length, Degree, and Exclusivity of Use

Applicant asserts that it has used the applied-for mark on circular diamond saw blades since March 2006. However, long and continuous use alone does not necessarily establish that a product feature has acquired distinctiveness. Where, as here, the applied-for mark is highly descriptive or non-distinctive, use for a period of approximately fourteen years is insufficient to establish acquired distinctiveness. *See In re Ennco Display*, 56 USPQ2d at 1286 (applicant's use of the product designs ranging from seven to seventeen years is insufficient to bestow acquired distinctiveness); *In re Kalmbach Publ'g Co.*, 14 USPQ2d 1490, 1492 (TTAB 1989) (deeming a Section 2(f) claim of more than 10 years of use insufficient for a highly descriptive mark "without specific evidence of the extent of the mark's exposure to the purchasing public and of the purchasers' perception of the asserted mark"); *In re Synergistics Research Corp.*, 218 USPQ 165, 167 (TTAB 1983) ("[W]e have consistently held that a declaration or affidavit of continuous and exclusive use as a mark for an extended period of years is insufficient in and of itself to support registrability under Section 2(f) of the Trademark Act where the term sought to be registered is highly descriptive in character"). Moreover, while Applicant claims to be the only company using cut-outs comprising the notch, curved cut-out and keyhole shown in the drawing on circular diamond saw blades,[94] Applicant does not claim to be the only company using curved cut-outs on any circular saw blades.

---

[94] September 12, 2016 Response to Office Action, TSDR 21 (Delahaut Decl. ¶11).

We agree with the Examining Attorney that the applied-for mark comprises an overall common basic shape or design used in the industry. As discussed *supra*, we find that Applicant's slight curve is substantially similar to many other third-party saw blades cut-outs of record. There are minor differences, but "[i]n order to be relevant to the question of whether applicant's mark has acquired distinctiveness, the third-party uses do not have to be identical to applicant's mark." *Saint-Gobain Corp. v. 3M Co.*, 90 USPQ2d 1425, 1440 (TTAB 2007) (color mark); *see also Goodyear Tire & Rubber Co. v. Interco Tire Corp.*, 49 USPQ2d 1705, 1720 (TTAB 1998) (differences between applicant's tire tread designs and third-party designs not shown by applicant to be of source-identifying significance). It is enough if the designs are substantially similar. *Converse,* 128 USPQ2d at 1547.

While absolute exclusivity is not required for a Section 2(f) registration, *see L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349, 52 USPQ2d 1307 (Fed. Cir. 1999), the widespread use of other substantially similar peripheral cut-outs in the industry— cut-outs that vary only marginally from Applicant's slightly curved design—is inconsistent with the "substantially exclusive" use required by the statute. *See Cicena Ltd. v. Columbia Telecommc'ns Grp.*, 900 F.2d 1546, 14 USPQ2d 1401, 1407 (Fed. Cir. 1990) ("evidence point[ing] strongly away from a finding of secondary meaning" included "the existence of other similar telephone designs which compete with the ROXANNE design"); *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 222 USPQ 939, 940-41 (Fed. Cir. 1984).

2. Amount and Manner of Advertising

Applicant provided a number of examples of its advertising of its Tiger Tooth blades on its website, on sell sheets, and on packaging, including the two shown below:[95]



---

[95] September 12, 2016 Response to Office Action, TSDR 36-52 (Delahaut Decl., Exh. 4-8).



"When advertisements are submitted as evidence of acquired distinctiveness, they must demonstrate the promotion and recognition of the specific configuration embodied in the applied-for mark and not of the goods in general." *Kohler*, 125 USPQ2d at 1516 (quoting *AS Holdings*, 107 USPQ2d at 1838). The sort of advertising that can demonstrate that a product design feature has acquired distinctiveness is commonly referred to as "look for" advertising, which directs consumers in no uncertain terms to "look for" the particular feature(s) claimed as a trademark. *Id.*; *In re Black & Decker Corp.*, 81 USPQ2d 1841, 1843-44 (TTAB 2006). "It does not refer to advertising that simply includes a picture of the product or touts a feature in a non-source identifying manner." *Stuart Spector Designs Ltd. v. Fender Musical Instruments Corp.*, 94 USPQ2d 1549, 1572 (TTAB 2009) (finding that advertisements

featuring prominent "beauty shots" of guitar body shape were not examples of "look-for" advertising and were not probative of acquired distinctiveness).

Applicant does not deny that its advertising is not "look-for" advertising, but argues that there is no requirement that an applicant use such advertising in order to establish secondary meaning.[96] Indeed, we acknowledged in *Stuart Spector Designs* that "[t]here are cases where the lack of 'look for' advertising [is] not fatal in view of industry practice to recognize certain configurations as source indicators." *Stuart Spector Designs*, 94 USPQ2d at 1574.

However, the evidence suggests that it is standard in the saw blades industry "to show a picture of a blade next to wording touting the merits of the blade" and "to include close-ups showing the cut-outs and edges of the blade."[97] Thus, in order for saw blade consumers to have any realistic chance of recognizing the applied-for mark in Applicant's advertising—separate and apart from other marks displayed therein—Applicant's advertising would have to "direct … the potential consumer in no uncertain terms to look for" the applied-for mark," which Applicant's advertising does not. *Id.*; *Kohler*, 125 USPQ2d at 1516; *see also In re ic! Berlin brillen GmbH*, 85 USPQ2d 2021, 2023-24 (TTAB 2008) (absence of look-for advertising "chief reason" for finding no acquired distinctiveness for claimed eyewear earpiece mark bearing applicant's word mark because "word and logo marks are different in nature from applicant's earpiece design" and the Board was "unable to conclude that the ultimate

---

[96] 12 TTABVUE 10.

[97] 9 TTABVUE 24.

consumer would view the earpiece design as applicant's trademark simply because it is the earpiece portion of the eyewear frame"). Applicant's advertising also shows an MK word mark; a FIRE TIGER TOOTH word mark; a Tiger Tooth Design logo; a swirling black and yellow design on the blade; other elements of the originally claimed mark that are no longer part of the claimed mark (e.g., notch, keyhole, and repeating pattern of three circular holes); and the blade teeth's, also being highlighted.

The Examining Attorney further observes that Applicant omits mention in any advertisement of its claim that its vacuum brazing process, used during the manufacturing of its blades, eliminates the need for cut-outs that are considered functional design features in the saw blade industry.[98] Applicant responds that this "would make no sense—and would be confusing to consumers—if Applicant's advertising made this claim, because Applicant's blades *do* have cut-outs."[99] Applicant obviously considers this typically functional feature important enough to consumers to include it in its blade design. Applicant's suggestion that consumers would be confused to learn that the cut-outs were not functional seems to undercut its claim that consumers merely view them as source indicators.

According to Applicant,

> the examiner's criticism of Applicant for not using "look for" advertising reveals a lack of understanding of business realities. There are various business considerations that influence an applicant's choice of how much advertising to do and what to say in its advertising and most of those considerations relate to how an applicant can most effectively increase

---

[98] 9 TTABVUE 15.

[99] 12 TTABVUE 11.

> sales of its products rather than how an applicant can make a showing under Section 2(f) in order to register a trademark for those products. For an examiner to try to dictate to the Applicant here—or any applicant—how it should advertise its product is to misconstrue the PTO's role in determining whether a mark should be registered.[100]

The Examining Attorney's focus on the lack of "look for" advertising in her analysis—an important part of acquired distinctiveness analysis, particularly so with product designs—is not dictating to Applicant how it should advertise its product. Applicant is certainly free to choose not to emphasize the curved cut-outs in its saw blades over other product features or other marks shown in its advertising if it believes that would affect its sales. But in doing so, Applicant is also choosing not to avail itself of potentially persuasive evidence that might assist in overcoming the presumption that "[p]roduct design almost invariably serves purposes other than source identification" and consumer awareness that "even the most unusual product design is [usually] intended not to identify the source of the goods, but to render the product itself more useful or appealing." *AS Holdings*, 107 USPQ2d at 1837 (citing *Wal-Mart*, 54 USPQ2d at 1069).

### 3. Amount of Sales and Number of Customers

Applicant indicates that its sales of Tiger Tooth saw blades have been very successful. According to Applicant, its sales numbers have increased over the years from 400 blades in 2007, the first full year of sales, to 1600 in 2017.[101] In total, Applicant sold 18,565 blades between March 2006 and December 2018, or "$1,578,025

---

[100] 12 TTABVUE 11.

[101] December 14, 2018 Response to Office Action, TSDR 108 (Delahaut Decl. ¶16).

worth."[102] However, Applicant provides no industry context for Applicant's unit sales figures, such as Applicant's relative market share of circular saw blades or its sales position vis-à-vis its competitors, thus diminishing the probative value of these raw numbers. *Target Brands Inc. v. Hughes*, 85 USPQ2d 1676, 1681 (TTAB 2007) (stating that it is difficult to accurately gauge the level of success in the relevant industry based on sales figures alone, in the absence of additional information such as market share).

Applicant's growth in sales may also reflect the growing popularity of its products, rather than recognition of its applied-for mark. *Braun Inc. v. Dynamics Corp.*, 975 F.2d 815, 24 USPQ2d 1121, 1133 (Fed. Cir. 1992) ("[L]arge consumer demand for Braun's blender does not permit a finding the public necessarily associated the blender design with Braun."); *In re Bongrain Int'l (American) Corp.*, 894 F.2d 1316, 13 USPQ2d 1727, 1729 (Fed. Cir. 1990) (growth in sales may be indicative of popularity of product itself rather than recognition as denoting origin). As a result, Applicant's sales figures fail to reflect public reaction to the applied-for mark as a source indicator for Applicant's circular saw blades.

### 4. Association as a Source Identifier by Consumers

Applicant's vice president, Brian Delahaut, explains that during demonstrations of the Tiger Tooth saw blades, Applicant's primary concern is the existence of "cheap knock-offs.[103] Applicant therefore explains to customers in those demonstrations that

---

[102] *Id.*

[103] December 14, 2018 Response to Office Action, TSDR 106-07.

the blade's unique cut-outs, including the curved portion Applicant refers to as a "jingle bell," will allow them to distinguish between Applicant's genuine blades and those that are just cheap knock-offs.[104] However, Applicant provides us with no information that would allow us to determine the frequency of those demonstrations, or the number, percentage, or type of customers who have attended them in comparison to purchases made through Applicant's other distribution channels.

According to Mr. Delahaut, the circular saw blade market is a highly visual business in which "customers do not clearly identify products by the model number or the name, and instead focus on something that is like a person's face that they can remember."[105] Mr. Delahaut also explains that orders of Applicant's Tiger Tooth saw blades are usually re-orders, and that at the time of re-ordering, the blade's distinct color combination and tiger-head logo are no longer visible because the blade has already been used and has worn off, leaving the "jingle bell" shape as "the only characteristic that allows customers to identify to their distributors which blade they want."[106]

Mr. Delahaut's statements on behalf of Applicant regarding consumer recognition have less probative value than consumer statements, *see, e.g.*, *In re Cent. Ctys. Bank*, 209 USPQ 884, 888 (TTAB 1981) (finding self-serving statements by applicant's

---

[104] *Id*. Applicant provided two examples of purported knock-offs in Exhibit 9 of Mr. Delahaut's September 9, 2016 declaration. None of them appear to show what Applicant refers to as a jingle bell design, but they are similar in the manner that many of the other third-party saw blades of record appear to be.

[105] September 12, 2016 Response to Office Action, TSDR 24 (Delahaut Decl. ¶18).

[106] December 14, 2018 Response to Office Action, TSDR 197 (Delahaut Decl. ¶14).

officials concerning consumer recognition entitled to "little, if any, probative value on the registrability question"). In any event, even if it is true that consumers often re-order saw blades by referring to the only features remaining after use, it does not mean that consumers do not consider those features to be functional or that the features are source identifiers. Consumer re-orders may allow us to infer that they like the product, but we cannot infer that the applied-for mark prompted those re-orders. Moreover, we do not consider it unusual for consumers to order products based on functional features that are not source indicators. For example, the fact that a dress purchased after the label has worn off is re-ordered by requesting "the one with five buttons"; or a firearm is purchased after the logo wears off by requesting "the one with the removable pistol grip"; or a guitar is ordered when the trademark wears off by requesting "the one with five strings," does not necessarily demonstrate that they are source-identifiers.

Applicant does not provide any survey evidence. However, Applicant does provide approximately twelve declarations from distributors that sell Applicant's Tiger Tooth blades, and approximately twelve declarations from customers that have purchased Applicant's Tiger Tooth blades, as further support for its contention that the applied-for mark has acquired distinctiveness.[107] We say "approximately" because some of the statements are by declarants who identified themselves, or were referred to by Applicant, as "distributors" or "customers" at different times. For example, Big Dog

---

[107] April 21, 2017 Response to Office Action, TSDR 30-41; September 12, 2018 Response to Office Action, TSDR 140-58; December 14, 2018 Response to Office Action, TSDR 87-98.

Diamond Products & Supplies provided at least three separate declarations from Nora Baron including two as a distributor, and one as a customer (based on her visit to stores).[108] US Saws provided two declarations from "Warren" Duncan as a distributor, and one from "Charles" Duncan as a customer (based on his visit to stores).

As a general matter, in cases such as this that involve ordinary consumer goods such as the circular saw blades at issue in this appeal, declarations from industry professionals attesting they recognize the product design at issue as Applicant's mark, though entitled to some weight, are not sufficient—particularly when a product design is at issue—to establish acquired distinctiveness.[109] *In re Meyer & Wenthe, Inc.*, 122 USPQ 372, 376 (CCPA 1959) ("It is incumbent upon the applicant to submit proof that its mark is distinctive, not only to 'experts' in the field, but to the purchasing public."). Further, while Applicant explains that it markets its Tiger Tooth blades to "fire and rescue teams, plumbers, masons, and general contractors,"[110] none of the declarations provided from Applicant's distributors indicate that they sell Applicant's blades to those categories of customers. Applicant also indicates it sells those blades

---

[108] April 21, 2017 Response to Office Action, TSDR 30; September 14, 2018 Response to Office Action, TSDR 87; September 12, 2016 Response to Office Action, TSDR 147.

[109] Applicant's distributor Ruff N Tuff Tools, in its December 11, 2018 declaration indicates that it sells Tiger Tooth blades exclusively (December 14, 2018 Response to Office Action, TSDR 91), which Applicant disputes ("[T]here is no evidence in the record that they sell only one brand" (12 TTABVUE 7).

[110] December 1, 2017 Response to Office Action, 102-03.

"into every channel of distribution."[111] Those channels include general hardware stores such as ACE Hardware, True Value, and Do-It-Best,[112] which cater to the general public. Therefore, we do not consider the declarations of approximately twelve of Applicant's distributors to be representative of the ordinary circular saw blade consumer.

Nor do we find Applicant's evidence consisting of twelve declarations from customers of Applicant's Tiger Tooth blade to establish acquired distinctiveness in the applied-for mark. Eleven of the declarations are "form declarations" that state the following:

> I have purchased Tiger Tooth circular saw blades marketed by MK Diamond Products, Inc. I am familiar with the appearance of circular saw blades marketed by competitors of MK Diamond Products, Inc. There are two aspects of the appearance of MK Diamond's Tiger Tooth blades that make them look different from the saw blades marketed by other companies: a series of cut-outs around the edge with an unusual shape and a set of three holes between these cut-outs. Based on my visits to stores that sell these blades and those of MK Diamond's competitors, as well as my purchases and use of MK Diamond blades, whenever I see a circular saw blade that has these two identifying characteristics, I know that that blade is manufactured by MK Diamond Products, Inc., because those aspects of the blade's appearance are distinctive and allow me to differentiate the Tiger Tooth blades from those of MK Diamond's competitors.

As an initial matter, we know nothing about the category of consumers to which these declarants belong (such as whether they are general contractors, general consumers, or otherwise), their level of knowledge about circular saw blades, the conditions of their purchases (such as when, where and for what purpose those

---

[111] September 12, 2016 Response to Office Action, TSDR 23 (Delahaut Decl., ¶17).

[112] *Id.* at 23 (Delahaut Decl., ¶14).

purchases were made), and under what conditions they were signed (such as how they were solicited). *See, e.g.*, *In re Lorillard Licensing*, 99 USPQ2d 1312, 1313 (TTAB 2011) (more than 6500 form customer statements found insufficient where little information was available about each "customer," who was defined as anyone who had ever purchased Applicant's brand of cigarettes). There is no evidence to suggest that this was a representative selection of possible declarants.

Second, the probative weight of the declarations is lessened by the fact that they are identical in form and are not composed individually. While form statements may be submitted as evidence of acquired distinctiveness, we generally find them—and find them here—to be less persuasive than statements expressed in a declarant's own words. *See Kohler,* 125 USPQ2d at 1507 (probative value of fill-in-the-blank declarations, "all essentially identical in form and … clearly not composed individually … are less persuasive than statements expressed in the declarants' own words.").

Third, given the highly non-distinctive nature of the mark, we do not find the statements of approximately twelve customers to be sufficient to satisfy Applicant's high burden to establish acquired distinctiveness. *See generally In re Pacer Tech.*, 338 F.3d 1348, 67 USPQ2d 1629, 1633 (Fed. Cir. 2003) (Where multiple affidavits are "nearly identical," "conclusorily worded," "represent the views of a small segment of the relevant market," "they are not the kind of 'competent evidence' that could carry Pacer's burden of rebutting the PTO's prima facie case."); *see also Benetton Grp., S.p.A.*, 48 USPQ2d 1214, 1217 (TTAB 1998) ("[G]iven the nature of applicant's

services, the statements of twenty three individuals do not establish an association of the [mark] with a single source by other than an extremely small number of the purchasing public."). Applicant provided no data concerning the number of relevant consumers of circular saw blades the United States, which we presume is fairly sizeable. Nor has Applicant provided any information on its percentage share of the market for circular saw blades. We find the number of witnesses presented here to be inadequate and not necessarily representative of the ordinary circular saw blade consumer.

The Examining Attorney argues that the witness statements, overall, "rely on the configuration of the entirety of the blade rather than the curved portion of the cut-out."[113] She further contends that many of the statements are contradictory and appear to have evolved over the course of prosecution during which time the mark was amended from the original to its current form.[114] Applicant does not dispute that there are discrepancies, but insists that "a claim that one portion of the design on a blade indicates source in Applicant is perfectly consistent with an earlier claim that two portions of the design indicates source in Applicant."[115] Applicant explains that

> As is obvious, the reason that the later declarations refer only to the curve in the cut-outs is simply that, between the time of the earlier declarations and the time of the later declarations, Applicant made a strategic decision to amend the mark to claim less of the design, so the later declarations referred only to the portion of the design for which Applicant was trying to prove secondary meaning. The difference

---

[113] 9 TTABVUE 18.

[114] *Id.* at 19, 25.

[115] 9 TTABVUE 12.

between the earlier and later declarations provides no reason to question the credibility of either set of declarations. And, indeed, the declarants swore to all of the declarations under penalty of perjury.[116]

We do have some concerns about the variance in some of the statements. While Applicant is entitled to make any strategic decision it wishes as to what it asserts to be "the mark," the fact that some witnesses identify a combination of features as the basis for finding Applicant's mark to be source-identifying but later modify their view in accordance with Applicant's strategy to highlight the significance of the curve itself does lessen the probative value of such statements, which do not specifically mention the curve, and include other elements no longer a part of the applied-for mark. As noted by the Examining Attorney, the distributor and customer statements, as well as Mr. Delahaut's declarations (particularly his declarations provided before the mark was amended to claim only the curved portion of the cut-outs as the mark), indicate that it is the combination of blade cut-out features, not the curve in particular, that causes recognition of the blade. We do not question the declarants' sincerity in providing the requested information and they may well believe their statements to be true. But taken as a whole, the statements are inadequate to demonstrate that the applied-for mark has acquired distinctiveness.

C. Conclusion as to Acquired Distinctiveness

All in all, given the highly non-distinctive nature of circular saw blade cut-outs, Applicant's evidence—of its length of use, amount of sales, types of advertising, and extent of recognition, taken together—fails to demonstrate that the relevant

---

[116] *Id.*

purchasing public has grown to recognize the primary significance of the curved-portion of its cut-outs as identifying the source of Applicant's circular saw blades rather than being a feature of the products themselves. For these reasons, we find that Applicant has not carried its "unusually high burden" of proving that its proposed marks have acquired distinctiveness. *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417, 424 (Fed. Cir. 1985); *In re Florists' Transworld Delivery, Inc.*, 106 USPQ2d 1784, 1794 (TTAB 2013).

**Decision:** The refusal to register is affirmed on both grounds.